Timothy J. BOWERS, Petitioner,

v.

Ira M. COINER, Warden, West Virginia Penitentiary, Respondent.

Civ. A. No. 2548.

United States District Court,
S. D. West Virginia,
Huntington Division.

Jan. 31, 1970.

**1066**

Nye King, Huntington, W. Va., for petitioner.

Chauncey H. Browning, Atty. Gen., Frank M. Ellison, Willard A. Sullivan, Asst. Attys. Gen., Charleston, W. Va., for respondent.

CHRISTIE, District Judge:

This proceeding comes before the Court on a petition for a writ of habeas corpus filed in forma pauperis by Timothy J. Bowers, a prisoner of the State of West Virginia, pursuant to the provisions of 28 U.S.C.A. § 2241. The sentence under which petitioner is confined was imposed by the Common Pleas Court of Cabell County for a term of fifteen years, on January 6, 1967, following a jury verdict finding him guilty of armed robbery. Having exhausted his state court remedies, petitioner seeks relief in this court based upon his various allegations of deprivation of his constitutional rights under the Fourth, Fifth, Eighth and Fourteenth Amendments.

Counsel was appointed and an evidentiary hearing was held on August 22 and 23, 1969, to test the validity of the constitutional deprivations alleged. On the basis of the evidence as developed at that hearing, the Court is of the opinion that the writ must be granted.

The facts bearing on the constitutional issues are found to be as follows: Petitioner was arrested in Columbus, Ohio, on June 24, 1966, by agents of the Federal Bureau of Investigation, upon a warrant issued at Huntington, West Virginia, for interstate flight to avoid prosecution, issued pursuant to 18 U.S.C.A. § 1073. At the time of his arrest petitioner was wanted as the alleged bandit in the daylight armed robbery of the Diversified Savings and Loan Company, located in Huntington.

The evidence reveals that petitioner was frequently a guest in the apartment of one William Engle and that he had a key to this apartment. At the time of his arrest, petitioner was asleep in Mr. Engle's apartment, as an invited guest. After the agents gained entrance to the apartment, petitioner was placed in handcuffs and, while there is conflicting

testimony about the time when he was advised of his Fifth Amendment rights in compliance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966), there is no conflict that the agents did seize two revolvers, a .38 calibre and a .25 calibre, and did conduct a thorough search of the premises. Before allowing petitioner to dress himself, the agents searched his clothes and removed some $375.00 from his trousers and some $19.00 from a shirt pocket. This money was never identified as a part of the money taken in the robbery. It is also to be noted that while the agents had knowledge of the existence of the outstanding fugitive warrant against the petitioner, they did not have the warrant with them, nor did they have a search warrant, although a United States Commissioner was available and they had sufficient time to have obtained a search warrant.

Subsequent to his arrest, petitioner was taken to the Franklin County Jail, in Columbus, where he was incarcerated after routine booking. Later that day, June 24, 1966, he was arraigned before the United States Commissioner, with counsel present, on the federal charge of interstate flight to avoid prosecution. Following his arraignment and while he was being returned to the Franklin County Jail, handcuffed and in the custody of a United States Marshal, he was observed by one William F. McMillan, an employee of the loan company. Mr. McMillan had been transported from Huntington to Columbus by two members of the Huntington Police Department for the purpose of identifying the suspected bandit. Mr. McMillan, later a key prosecution witness at petitioner's trial, related to the Huntington police, following this confrontation, that petitioner was a "dead ringer" for the bandit. Also, during this transfer, petitioner was photographed by a news photographer and his picture was subsequently published in both the Columbus and Huntington newspapers.

Extradition was performed and petitioner was taken to the Cabell County jail on September 16, 1966. Prior to petitioner's return to Huntington, the grand jury of Cabell County, West Virginia, returned an indictment on September 12, 1966, charging petitioner with the armed robbery of the loan company. On September 19, 1966, petitioner was taken before the Common Pleas Court of Cabell County. On that date he was appointed counsel and the judge of that court set October 10, 1966, as the trial date.

At trial, the bulk of the state's case against the petitioner was founded upon eye-witness identifications by the employees of the loan company. The testimony of these witnesses was crucial and may be tersely summarized as follows: Mr. McMillan, who had been taken to Columbus to identify the suspected bandit, positively identified the petitioner as the bandit. Mrs. Shain identified petitioner as the bandit, but stated that she reached this conclusion only after seeing petitioner's picture by itself after it was brought to her by the police. Mrs. Roach and Miss Damron testified that they picked petitioner out of a group of pictures (7 or 8) and their positive identifications were premised upon the characteristics of his mouth and nose. Mr. Duncan was unable to identify the petitioner as the bandit.

The prosecutor attempted to introduce a .38 calibre revolver into evidence as being the holdup weapon. A police officer, while on the witness stand, exhibited the weapon to the jury. It was marked for identification purposes, but ultimately was not allowed into evidence by the trial judge. The basis of the trial court's ruling was that the state had failed to connect the gun with the petitioner and the holdup. However, after this ruling, there was considerable comment about the gun by both the prosecutor and the trial judge, a subject with which we will later deal in detail. After the guilty verdict was returned, the petitioner immediately informed his court-appointed counsel of his desire to appeal. Counsel dutifully made a motion to set aside the verdict and award a

new trial. On two occasions counsel was granted a continuance of a hearing on the motion on the ground that the trial record had not yet been typed and counsel had not had an opportunity to study it. Apparently, during this interval, petitioner became disenchanted with his court-appointed counsel and he and his mother retained private counsel for the purpose of appealing the conviction if his motion for a new trial was denied. After accepting employment, private counsel told petitioner he would stay in the background until the motion to set aside the verdict and award a new trial had been disposed of. The motion was denied by the trial court on January 6, 1967. On January 23, 1967, an order with an attached affidavit was entered whereby court-appointed counsel were relieved of further responsibility in the case and the privately retained counsel was noted as counsel of record. Private counsel then prepared a bill of exceptions and sought a writ of error and supersedeas in the Circuit Court of Cabell County. This was denied. The retained counsel did not prosecute the appeal further. No formal order relieving him of representation of petitioner has been entered.

For the sake of clarity, the issues raised by the alleged errors will be considered separately.

I

The petitioner alleges that the arrest warrant for unlawful flight to avoid prosecution is void since the complainant could not testify that he had personal knowledge of the allegations in the complaint that he swore to in front of the United States Commissioner. The FBI agent who signed the complaint before the Commissioner testified that his oath to it was premised upon a letter from the prosecutor of Cabell County to the United States Attorney stating that a state warrant had issued for petitioner's arrest for armed robbery. The agent candidly testified that he had no personal knowledge that the state warrant was outstanding. The petitioner asserts that under this state of facts, "probable cause" for the issuance of a warrant had not been established. We cannot agree.

■ It has long been an established principle that only the probability and not a prima facie showing of criminal activity is the standard of probable cause, Beck v. Ohio, 379 U.S. 89, 85 S. Ct. 223, 13 L.Ed.2d 142 (1964), and that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial. McCray v. Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967). In judging probable cause magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, United States v. Ventresca, 380 U.S. 102, 85 S. Ct. 741, 13 L.Ed.2d 684 (1965), and their determination of probable cause should be paid great deference by reviewing courts. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, 78 A.L.R.2d 233 (1960). In Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the Supreme Court of the United States recognized that the constitutional requirement of probable cause could be satisfied by hearsay information. Certain guidelines to determine the reliability of the informant's information were adopted by the Supreme Court in Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L. Ed.2d 637 (1969), and under this holding, the "informant" in the case at bar would be the prosecutor and the police officers who told the United States Attorney that a "state warrant" was outstanding against the petitioner. In deciding on appeal whether probable cause existed for the issuance of a warrant, the Court may consider only the information which was before the Commissioner. Aguilar v. Texas, supra; Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). Under *Spinelli*, probable cause cannot be predicated upon a tip of an informer of unknown reliability, however, from the holding of *Aguilar*, allowing probable cause to be established by hearsay, it follows that when the reliability of the

"informant" is proven and when the circumstances upon which the complaint is based are stated with particularity, identifying the source of his information, probable cause clearly has been established.

## II

The petitioner alleges that the manner in which his arrest was accomplished was unlawful and unconstitutional under the Fourth Amendment of the United States Constitution. He grounds this allegation upon the fact that the arresting FBI agents did not have in their physical possession a fugitive warrant for his arrest and that the method of entry into the apartment caused him to be subjected to an unconstitutional seizure under the Fourth Amendment, which guarantees him the right to be secure in his person, house, papers and effects.

At the plenary hearing in this case the arresting FBI agents testified that while it was true they did not have a fugitive warrant in their physical possession, they knew of its existence by a teletype message to their regional office. Since petitioner was charged with a federal felony offense, federal agents who had reliable information of an outstanding warrant for such offense could effect a valid arrest without having the warrant in their actual physical possession. Bartlett v. United States, 232 F. 2d 135 (5th Cir. 1956); United States v. Donnelly, 179 F.2d 227 (7th Cir. 1950). Thus, the petitioner's contention that it was necessary for the arresting officers to have the fugitive warrant in their physical possession at the time of the arrest is untenable.

We will now scrutinize the manner in which petitioner was arrested. 18 U.S.C.A. Section 3109, provides:

"The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, *if, after notice of his authority and purpose*, he is refused admittance or when necessary to liberate himself or a person aiding him on the execution of the warrant." (Emphasis added).

In Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), this statute was construed as applying equally to an officer's entry to arrest *without* a search warrant and to an entry *with* a search warrant. 357 U.S. at 306, 78 S.Ct. 1190. Furthermore, its application is necessary "whether the arrest is to be made by virtue of a warrant, or when officers are authorized to make an arrest for a felony without a warrant." 357 U.S. at 309, 78 S.Ct. at 1195. The Court remarked that notice should take the form of *"an express announcement by the officers of their purpose for demanding admission."* 357 U. S. at 309, 78 S.Ct. at 1196. (Emphasis added). The Supreme Court, in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), citing the *Miller* case with approval, said that the statute (18 U.S.C.A. Section 3109) requires an officer to state his authority and purpose at the threshold, and to clearly identify his office or his mission. 371 U.S. at 482, 83 S.Ct. 407. In *Wong Sun*, the defendant's arrest was held unlawful when a narcotics agent affirmatively misrepresented his mission (at the threshold), stating that he had come for laundry and dry cleaning, not to effect an arrest. His entrance was considered unlawful because he could not dispel the "misimpression engendered by his own ruse." 371 U.S. at 482, 83 S.Ct. at 415; Cf. Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921).

In the case at bar, the testimony of FBI agent Bedell, the agent in charge of the operation, reveals how admission was gained to the apartment in order to effect the arrest,

"* * * together with other agents then we attempted to arouse the occupants of Apartment 2. It was observed that the lights were on but there could be no activity seen. There was no response to a knock on the door, so I went across the street at a pay telephone and dialed the telephone

number of William Engle, the occupant of that apartment. The telephone was answered. I asked if this was Mr. Engle. He said 'yes.' I said, 'There are FBI agents outside of the door wanting to talk to you. Will you answer the door? At the time I could hear a knock on the door through the telephone. He said 'They are here now.' I hung up and walked back across the street. By this time the other agents had gained entrance to the apartment."

"Q. At the time you went into this apartment, am I correct that you went in under the pretense of talking with Mr. Engle to the effect that you wanted to talk to him, is that correct?

"A. It was no pretext. I called Mr. Engle and said that there were FBI agents at his door and wanted to talk with him.

"Q. Did you tell him anything concerning an arrest of any person at that time?

"A. No."

Agents Heffernan and Maley, who were at the door, neither announced their authority nor their purpose. According to their own testimony, when Mr. Engle opened the door in response to the telephone call from Agent Bedell, they, with their guns drawn, demanded the whereabouts of petitioner. Mr. Engle responded by pointing in the general direction of the bedroom. The agents then proceeded into the bedroom where petitioner was sleeping and placed him in handcuffs and under arrest.

We can only conclude that under these admitted facts, the entry and the subsequent search and arrest were in violation of petitioner's Fourth Amendment rights and were contrary to the specific prohibitions adopted in *Miller* and *Wong Sun*.

Therefore, since it is found that petitioner was unlawfully arrested upon the federal charge of interstate flight to avoid prosecution, his return by reason of such unlawful arrest to West Virginia to face the state charge of armed rob-

bery was likewise unlawful, thus rendering his subsequent conviction tainted and his imprisonment unlawful. Under normal circumstances, it would be unnecessary for us to consider the other allegations raised in his petition, however, in this case, we wish to base our holding upon alternative grounds, and for this reason, we will inquire into the other issues.

### III

 The petitioner alleges that the out-of-court identification procedure employed with the witness McMillan and the procedure itself were so highly suggestive and prejudicial to him, such procedure being a "critical stage" of the proceedings against him, that the subsequent in-court identification by the same witness is so tainted that it could not be used against him. The petitioner looks to the recent Supreme Court case of United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), as the legal authority to support his allegation.

We agree with petitioner that the facts surrounding the procedure employed with the witness McMillan are on all fours with the practice condemned by *Wade*. However, the petitioner is not entitled to the relief that the *Wade* decision would otherwise afford him. In Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), a companion case to the *Wade* decision, it was specifically held by the Court that the principles enunciated in *Wade* were to be applied prospectively only,

"We hold that *Wade* and *Gilbert* affect only those cases and all future cases which involve confrontations for identification purposes conducted in the absence of counsel after this date." 388 U.S. at 296, 87 S.Ct. at 1969.

Further, at p. 300, 87 S.Ct. at p. 1972,

"We also conclude that, for these purposes, no distinction is justified between convictions now final, as in the instant case, and convictions at various stages of trial and direct review."

The *Wade* was decided June 12, 1967, and petitioner's conviction was October 11, 1966. But if the rule were otherwise, the petitioner was not prejudiced, since he was identified positively in court by two other witnesses under proper circumstances. United States v. Davis, 407 F.2d 846 (4th Cir. 1969).

### IV

The petitioner alleges that the total effect of the several trial errors committed in the state court was so damaging as to deprive him of a fair trial and that he was thereby denied "due process of law" under the Fourteenth Amendment.

■ As a general rule, mere procedural errors are not a proper subject for a federal writ of habeas corpus, as the writ is not a substitute for a writ of error or an appeal. Glasgow v. Moyer, 225 U.S. 420, 32 S.Ct. 753, 56 L.Ed. 1147 (1912); Riddle v. Dyche, 261 U.S. 333, 43 S.Ct. 555, 67 L.Ed. 1009 (1923); Eagles v. United States ex rel. Samuels, 329 U.S. 304, 67 S.Ct. 313, 91 L.Ed. 308 (1946). However, when the cumulative effect of trial errors is of such magnitude as to offend "a sense of justice," due process is denied and the writ will issue. Rochin v. California, 342 U.S. 165, at 169, et seq., 72 S.Ct. 205, 96 L. Ed. 183, 25 A.L.R.2d 1396 (1951); Austin v. Peyton, D.C., 279 F.Supp. 227.

■ The petitioner seeks to avail himself of this exception not alone upon the cumulative effect of the trial errors noted, but also upon the prejudicial effect upon the jury of testimony and comments relating to the .38 calibre revolver which, as previously stated, the FBI seized along with various other items, belonging to the petitioner. At trial, the prosecutor sought to have said revolver introduced into evidence. The gun was exhibited to the jury by a police officer who, while on the witness stand, testified before the jury as to the type of the gun, stating that it belonged to the petitioner and that it was the type of weapon that the employees of the loan company had told him the bandit had used in the holdup.[1] Then, outside of the hearing of the jury, the trial judge ruled the gun inadmissible. When the jury returned, they were not informed that the gun was not in evidence. On the following day, the prosecutor, in his final argument, stated that the petitioner "brandished that gun" and upon "this evidence" the jury should return a verdict of guilty. The trial judge, after refusing to instruct the jury that they were to disregard all testimony in reference to the gun and upon directing the jury to their room to consider their verdict, made the following statement: " * * * and the gun, you may take that to your room." The record is inconclusive as to whether the gun was actually sent to the jury room along with the other exhibits received in evidence in the case, but it must be assumed that the judge's order was complied with. The cumulative effect of all this could not help but elevate in the minds of the jury that the gun was valid evidence to be used against the petitioner.

In Fahy v. Connecticut, 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), the Supreme Court of the United States, speaking through Chief Justice Warren, held:

"We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of. *The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.*" 375 U.S. at 86, 84 S.Ct. at 230. (Emphasis added).

The Court expanded the concept in the recent case of Chapman v. California,

---

1. This obvious hearsay was not objected to by trial counsel. Furthermore, it was "pyramiding hearsay" as the police officer testified at the evidentiary hearing in this case that he *was not* the officer that interviewed the employees. Also, the employees on direct testimony could not, or did not, testify as to the type of gun, other than a revolver, that the bandit employed.

386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, 24 A.L.R.3d 1065 (1967), wherein it held that the admission of "highly prejudicial evidence or comments" casts the burden on the one other than the injured party of showing that it was harmless. No such showing was made or attempted here. Thus, we cannot say that the comments of the prosecutor and of the trial judge with reference to unadmitted evidence (the gun) did not have the effect, in the words of Chief Justice Warren, of "forging another link between the accused and the crime charged." Fahy v. Connecticut, 375 U.S. at 89, 84 S.Ct. at 231. We believe that under this set of circumstances, the test of a "reasonable possibility" that the tainted comments "might have contributed to the conviction" is satisfied. Moreover, we are unable to declare, under the additional requirement of *Chapman*, that the constitutional error was "harmless beyond a reasonable doubt." 386 U.S. at 24, 84 S.Ct. 824.

These errors and irregularities were undoubtedly harmful and prejudicial to the defendant and must be viewed as stripping the state trial of fundamental fairness. They, of course, should have been made the subject of review by direct appeal to the state's highest court. But unfortunately this was not done, for reasons hereinafter discussed, and the time therefor has long since expired. As serious as the initial crime in this case was, it does not help society to deny the defendant due process of law and to let him linger in doubt as to whether he was denied the fair trial, which our institutions, our laws and our constitutional guarantees demand. The far wiser course is for this court in this proceeding to make it possible for this defendant to have a new trial according to the precepts of due process. This we shall do.

## V

There is one other totally independent ground upon which relief could be granted to the petitioner. Although it was not raised in the petition, petitioner's counsel nevertheless effectively developed it at the evidentiary hearing. It has to do with the quality of representation the petitioner got from his retained counsel at the appeal level.

 As a starting premise, the Sixth Amendment provides that,

"In all criminal prosecutions, the accused shall enjoy the right to * * * have the Assistance of Counsel for his defense."

This mandate is made applicable to the states through the Fourteenth Amendment. Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799, 93 A. L.R.2d 733 (1963). Since Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), appellate review and the assistance of counsel have been made available to indigent criminal defendants. This assistance of counsel concept on appellate review has been extended as well by federal courts to include employed counsel. See Camp v. United States, 352 F.2d 800 (5th Cir. 1965); Kennedy v. United States, 259 F.2d 883 (5th Cir. 1958), cert. den., 359 U.S. 994, 79 S.Ct. 1126, 3 L.Ed.2d 982 (1959). We regard as sound law that when employed counsel fails to take an appeal within the time permitted, without clearly informing his client of his intention not to do so, and without assisting, or offering to assist, the client in having other counsel appointed in his place, the retiring counsel has breached his duty to his client and the latter's constitutional right to the effective assistance of counsel on appeal under the Sixth Amendment has been violated. United States ex rel. Maselli v. Reincke, 383 F.2d 129 (2d Cir. 1967); Turner v. North Carolina, 412 F.2d 486 (4th Cir. 1969); Williams v. Coiner, 392 F.2d 210 (4th Cir. 1968); Wynn v. Page, 369 F.2d 930 (10th Cir. 1966). Such would also seem to be in accord with Canon 44 of the West Virginia Code of Professional Ethics (1 W.Va. Code p. 391) which provides in pertinent part that,

"The right of an attorney or counsel to withdraw from employment, once assumed, arises only from good cause. Even the desire or consent of

the client is not always sufficient. The lawyer should not *throw up the unfinished task* to the detriment of his client except for reasons of honor or self-respect. * * * If the client * * * deliberately disregards an agreement or obligation as to fees or expenses, the lawyer may be warranted in withdrawing on *due notice to the client, allowing him time to employ another lawyer.*" (Emphasis added).

Impecuniosity of the petitioner and his mother was the reason the attorney was not paid, and the hearing evidence in this court clearly shows there was no *deliberate* intent on their part not to raise the money requested by the attorney. Likewise, the evidence establishes that the attorney *gave no notice of his intent to withdraw from or abandon the case*, nor did he ever move the Court for permission to do so. For aught as appears, the attorney is still counsel of record. Under such circumstances, we find the conduct of the attorney and the explanation given for his reason for not pursuing an appeal to the West Virginia Supreme Court of Appeals following the denial of a writ of error and supersedeas by the Circuit Court of Cabell County to be highly unsatisfactory. This is especially true since it would appear that petitioner and his mother had retained this lawyer only after he had represented to them and assured them that petitioner's chances for a reversal on appeal were quite good. The pertinent part of the attorney's testimony at the plenary hearing is set forth below,

"*Court*: Now, * * *, you argued the case or briefed it to the Circuit Court, Judge Hereford?

"A. Yes, sir.

"*Court*: And he upheld the trial court?

"A. Yes, sir.

"*Court*: Now, were you employed to take the case any further?

"A. We didn't discuss any further; we felt there was adequate

grounds in the Circuit Court for it to be reversed and we did not—I had anticipated taking it further, yes, sir.

"*Court*: Well, after the Circuit Court turned you down, then what did you do?

"A. I had started the—done most of the papers for the appeal to the State Supreme Court but I was never paid."

It is thus revealed that the attorney equated his services to his client solely on the basis of the latter's ability to pay. In the area of criminal justice this is a too narrow concept of an attorney's responsibility to his client, and this Court will not give sanction to it. This, of course, is not to say that considerations of monetary remuneration are not proper elements in the attorney-client relationship, for they undoubtedly are, but we do say they must not be permitted to become and be the only motivation. As an officer of the court, an attorney must share with the court the responsibility of administering justice. This has long been recognized as a noble characteristic of the profession and it must be nurtured and preserved at all times. This higher duty, the attorney owes not alone to his client, but to society as well.

Our Circuit Court of Appeals for the Fourth Circuit has become increasingly concerned with the number of state habeas corpus cases coming there for review where the defendants were not adequately represented at either the trial or appeal level. This caused the Court to recently review its past decisions where the question of ineffective assistance of counsel was raised, and in an exhaustive opinion in Nelson v. Peyton, 4 Cir., 415 F.2d 1154, decided June 15, 1969, it let it be clearly known that the constitutional requirement that criminal defendants have effective assistance of counsel at both the trial and appeal levels would thenceforth be more stringently applied.

As previously has been noted, the trial record for use on appeal was available to the attorney in this case, yet notwith-

standing his testimony that "most of the papers for the appeal to the State Supreme Court" had been completed, no petition for an appeal was ever filed in that court—why? Because, according to the attorney, the petitioner and his mother could not come up with additional money. While this was an insufficient excuse, as we have indicated, for not filing the appeal, his dereliction is compounded by the fact that he must have known of the approximate $400.00 which was taken from the accused at the time of his arrest and held by the police. This money was not in evidence and no reason seems apparent why by the slightest diligence on the part of the attorney its release could not have been readily secured for use by the petitioner in defraying the costs of the appeal. Moreover, it does not appear that the attorney ever made it clear to the petitioner that he could have counsel appointed by the Court to prosecute his appeal to the State Supreme Court upon a showing of indigency. This type of dereliction is even less understandable when it is viewed in the light of the attorney's assurance when employed, as previously noted, that the chances for reversal of the conviction on appeal were "very good." These facts lead us to the inescapable conclusion that the petitioner was deprived of the right to have his case reviewed by the state's highest court by the failure of his retained counsel to effectively represent him. Nelson v. Peyton, supra. If this were the only deprivation found, we would utilize the procedure authorized by State ex rel. Bradley v. Johnson, 166 S.E.2d 137 (W.Va.1969), however, because of the other deprivations noted, such a procedure is impracticable.

In a situation such as this, we find the language employed by Judge Boreman, of our Fourth Circuit, in the case of Turner v. North Carolina, 412 F.2d 486, at 490 (4th Cir. June 16, 1969), to be quite appropriate,

"* * *, the Court is of the opinion that the proper course to be taken by this Court is to award the petitioner the maximum relief that he could have obtained if his appeal had been properly perfected and he had been successful in prosecuting it. This can be accomplished by directing that the petitioner be accorded a new trial, if the state desires to retry him for the offense * * * otherwise that he be released from custody. Such a disposition will vindicate the petitioner's constitutional rights and operate to correct the constitutional error committed against him. As pointed out in Dowd v. United States ex rel. Cook, 340 U.S. 206, 71 S.Ct. 262, 95 L.Ed. 215, [19 A.L.R.2d 784] (1951), '(T)he District Court has power in a habeas corpus proceeding to "dispose of the matter as law and justice require." ' " 28 U.S.C. 2243; [Coffman v. Bomar,] 220 F.Supp. 343 at 349 [(M.D.Tenn. 1963); Pate v. Holman, 341 F.2d 764 (5th Cir. 1965)].

This Court has inquired into the facts and circumstances concerning the petitioner's allegations that he was deprived of his constitutional rights under the Eighth Amendment (excessive bail), and can find no basis in fact or law for such a claim.

### VII

In light of the above observations and findings, it is our conclusion that the writ of habeas corpus should issue and petitioner Timothy J. Bowers be released from imprisonment, subject to the right of the state to retry him on the charge within a reasonable time, should it so elect.

We wish to commend Mr. Nye King, of the Huntington Bar, for his diligent, able and conscientious representation of the petitioner, all done without expectation of pay.