**UNITED STATES of America,**
**Appellee,**

v.

**Charles B. BRADLEY, Jr., et al.,**
**Defendants-Appellants.**

**Nos. 71–1186 to 71–1189.**

United States Court of Appeals,
First Circuit.

Heard Nov. 1, 1971.

Decided Jan. 27, 1972.

On Rehearing March 10, 1972.

William P. Homans, Jr., Boston, Mass., for Byron H. Johnson and William Helliesen, appellants.

Stanley R. Lapon, Cambridge, Mass., for Charles B. Bradley, Jr., appellant.

Edward M. Altman, Cambridge, Mass., on brief for Robert T. Odell, Jr., appellant.

Paul F. Ware, Jr., Asst. U. S. Atty., with whom Herbert F. Travers, Jr., U. S. Atty., was on brief, for appellee.

Before ALDRICH, Chief Judge, BREITENSTEIN, Senior Circuit Judge,* and McENTEE, Circuit Judge.

McENTEE, Circuit Judge.

This is the consolidated appeal of four defendants, Bradley, Johnson, Odell, and Helliesen, who were tried together before a jury on a six-count indictment. All were found guilty of conspiracy to sell a narcotic drug not in pursuance of a written order [1] (Count 1). All but defendant Johnson were charged with and convicted of carrying firearms during the commission of a felony [2] (Counts 4, 5, and 6). Defendants Johnson and Bradley were also charged with selling cocaine [3] (Counts 2 and 3), but the jury acquitted them on those two counts. The defendants urge reversal of their convictions on a number of grounds, generally attacking the legality of arrests and searches, the sufficiency of the government's evidence, and the conspiracy instructions given by the trial judge.

The case involves a proposed narcotics transaction between the defendants and federal undercover narcotics agents. The agents, through an informer named Arthur Motsis,[4] contacted defendant Bradley, who said he could arrange for the sale to them of one and a half pounds of cocaine. Preparations for this transaction began on March 4, 1971, and continued until March 12. On that day, at approximately 9:20 p. m., Motsis and Agents Egan and Ross went to the first floor apartment at 73 Magazine Street, Cambridge, Massachusetts. Bradley, apparently alone in the apartment, admitted them,[5] and five minutes later these four went outside to the agents' car to count the money. Bradley stated that the price was $9,500, which was $500 more than the agents had with them. The agents and Motsis then left to get the extra money, and returned at approximately 11:05 p. m.

Upon their return, the agents and the informer were admitted by defendant Odell, and within the next few minutes all the defendants were present in the apartment. In the course of conversation, Bradley admitted that he had a gun. Defendant Johnson produced a sample of the cocaine in a tinfoil packet, which was placed on a scale by Agent Egan. Each of the defendants sampled a bit of the cocaine, which remained on the scale after this sampling. Several minutes later, defendants Johnson, Helliesen, and Bradley left the apartment. Johnson and Helliesen were to get the main supply of cocaine from their car; Bradley apparently just drifted out to the courtyard of the apartment building. Agent Egan and informer Motsis left to get the money from the government vehicle; Agent Ross remained in the apartment with Odell.

After a quick drive around the block to check the area, Johnson and Helliesen exited from their car and started toward the apartment. Johnson was carrying a flight bag later determined to contain

---

* Of the Tenth Circuit, sitting by designation.

1. In violation of 26 U.S.C. § 7237(b). Repealed Pub.L. 91–513, § 1101(b) (4) (A), October 27, 1970, 84 Stat. 1292, effective date of repeal being May 1, 1971, Pub.L. 91–513, § 1105(a). Defendants each were sentenced to five year prison terms, the minimum sentence under 26 U.S.C. § 7237(b).

2. In violation of 18 U.S.C. § 924(c) (2). Each received a one year suspended sentence and was placed on probation for three years, to be served on and after the five year sentence.

3. In violation of 26 U.S.C. § 4705(a). Repealed Pub.L. 91–513, § 1101(b) (3) (A), October 27, 1970, 84 Stat. 1292, effective date of repeal being May 1, 1971, Pub.L. 91–513 § 1105(a).

4. Motsis was named in Count 1 as a co-conspirator but not as a defendant.

5. It was necessary to go through three doors to enter the apartment. The outer door to the building was closed but unlocked. Next was the foyer door, which operated on a buzzer lock system. In a direct line with these two doors was the door to the apartment itself.

sixteen plastic bags of cocaine. Motsis remained in the government car, and Egan followed Johnson and Helliesen from the street to the apartment building. A ten-man government surveillance team was in the immediate vicinity.

It is at this point, the time of re-entry into the apartment building at 11:35, that the evidence adduced at the pre-trial hearing on defendants' motion to suppress becomes contradictory. Agent Egan testified that Johnson and Helliesen preceded him through the unlocked outer door, at which time Odell opened the apartment door and saw them standing there. Odell buzzed open the foyer door, and Johnson, Helliesen and Egan entered. Egan stated that when the foyer door was opened, Agent Maloney was a few steps behind him, followed by the rest of the surveillance team. Agent Ross, who was inside the apartment with Odell discussing the pending sale, testified that Odell opened the apartment door, looked out, and then buzzed open the foyer door. Helliesen and Johnson entered, followed by Egan and then the surveillance team. Johnson, Helliesen, and Odell were arrested immediately. A third agent testified that he peaceably arrested Bradley on the steps outside the apartment building after Egan had passed through the foyer door. Bradley, however, testified that Helliesen and Johnson were totally inside the apartment when Egan and the other agents ran up to the apartment building, grabbed Bradley, opened the unlocked outer door, and then shoved Bradley against the foyer door, causing the lock to break and spring open. Bradley did not recall how the apartment door was opened. Odell testified that while in the apartment with Johnson and Helliesen he heard a loud bang from the direction of the foyer door, and seconds later the apartment door was opened from the outside and about ten agents streamed in.

Based on this evidence the court found that the entry was not by force, Odell having voluntarily buzzed open the foyer door and opened the apartment door. The trial judge further found that any delay in order to obtain a warrant or any announcement of authority and purpose would likely have permitted the destruction of evidence. It therefore ruled that the arrests were legal and denied the motions to suppress.[6]

▮ Defendants challenge the legality of the arrests on several grounds, the first being that they violated 18 U.S.C. § 3109.[7] This statute is applicable to the entry of federal officers, Sabbath v. United States, 391 U.S. 585, 588–589, 88 S.Ct. 1755, 20 L.Ed.2d 828 (1968),[8] and its standards apply to entry to execute a warrantless arrest, Miller v. United States, 357 U.S. 301, 306, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958). Defendants' contention that the agents employed force to enter at 11:35 is without merit, since the finding of no force by the trial court, which was far from "clearly erroneous," is binding on this court. Nor was the court obligated to reverse its ruling or reopen the hearing when evidence adduced at the trial allegedly contradicted the pre-trial evidence.[9] The court did not refuse to consider the evidence, *cf.*

---

6. The defendants sought to suppress the cocaine found in the flight bag and the sample of cocaine found on the scales in the apartment, as well as the firearms found incident to arrest.

7. 18 U.S.C. § 3109 provides:
   "The officer may break open any outer or inner door' or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant."

8. This court's decision in Jackson v. United States, 354 F.2d 980 (1st Cir. 1965) is not to the contrary. In that case the entry was made simultaneously by both state and federal officials. State law governs the arrest by state officials for federal offenses, Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), but where only federal officials are involved, federal law is controlling, *Sabbath, supra.*

9. Agent Lambert, a member of the surveillance team, testified that he watched the 11:35 entry from approximately seventy-five yards away with the aid of field

Rouse v. United States, 123 U.S.App.D.C. 348, 359 F.2d 1014 (1966), but reasonably believed that it did not compel a different finding.[10] There was no abuse of discretion in not conducting a further hearing on the matter.

■ Defendants contend that, notwithstanding the absence of force, 18 U.S.C. § 3109 was violated by use of a ruse.[11] While a physical breaking is not required for a § 3109 violation, Sabbath v. United States, *supra*, the Supreme Court has expressly reserved the question of a ruse. Id., 391 U.S. at 590, n. 7, 88 S.Ct. 1755. Since *Sabbath* the lower federal courts have spoken variously on the question,[12] and this court has not yet passed on it. While the matter is of substantial importance, we do not reach the question in this case due to the prior lawful entry of Agent Ross.[13]

■ When Agent Egan and the surveillance team entered at 11:35 on March 12, Agent Ross was already inside the apartment. His entry at 11:05 with Egan was clearly lawful. As in Lewis v. United States, *supra* note 11, the agents were invited into the apartment for the purpose of executing a felonious sale of narcotics, and the defendants' only concern was that the agents were willing purchasers, which they were. Following the lawful entry, Agent Ross remained in the apartment. The defendants do not allege, nor could they, that Ross's presence suddenly became unlawful or that their privacy suddenly was invaded solely because his role changed from undercover agent to arresting officer. To so hold, as was stated in Lewis v. United States, *supra* 385 U.S. at 210, 87 S.Ct. at 427, would "come near to a rule that the use of undercover agents in any manner is virtually unconstitutional *per se*." The lawful presence of a government agent precludes any argument that later entries violate the privacy of occupants. Since privacy is what § 3109 seeks to protect, the prior lawful entry and continued presence of Agent Ross vitiates any impropriety of subsequent entries. *See* United States v. Marson, 408 F.2d 644 (4th Cir. 1968), cert. denied, 393 U.S. 1056, 89 S.Ct. 695, 21 L. Ed.2d 698 (1969); Cognetta v. United

glasses. Lambert saw Johnson, Helliesen, and Egan approaching the apartment building, and then his vision was obstructed. The next time Lambert saw Egan, the latter was about to enter the outer door, and Johnson and Helliesen were not in sight. The defendants contend this is consistent with the pre-trial testimony of Bradley, and Odell that Johnson and Helliesen entered the apartment a considerable time before Egan entered. It is not, however, inconsistent with the agents' testimony that Johnson and Helliesen merely preceded Egan through the outer door.

10. "The Court: I agree there is additional testimony but it does not change my view of the ultimate facts."

11. The ruse is alleged to have occurred at 11:35 when Egan entered the apartment as an undercover agent *for the purpose of arrest*. The defendants argue that the agent's purpose sufficiently distinguishes the situation from Lewis v. United States, 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), where the undercover agent entered for the very purposes contemplated by the occupant.

12. For post-*Sabbath* decisions on the issue, *see, e. g.*, United States v. Beale, 445 F.2d 977 (5th Cir. 1971) (ruse does not violate § 3109) (but see Tuttle, J., dissenting); United States v. Harris, 140 U.S.App.D.C. 270, 435 F.2d 74 (1970), cert. denied, 402 U.S. 986, 91 S.Ct. 1675, 29 L.Ed.2d 152 (1971) (ruse violates § 3109); United States v. Syler, 430 F.2d 68 (7th Cir. 1970) (ruse does not violate § 3109); Ponce v. Craven, 409 F.2d 621 (9th Cir. 1969), cert. denied, 397 U.S. 1012, 90 S.Ct. 1241, 25 L.Ed.2d 424 (1970) (ruse does not violate analogous state statute); Bowers v. Coiner, 309 F.Supp. 1064 (S.D.W.Va.1970) (ruse violates § 3109); United States v. Burruss, 306 F.Supp. 915 (E.D.Pa.1969) (implies but does not decide that ruse violates § 3109).

13. Nor need we reach the questions of whether the action of the federal agents constitutes a ruse, *see* note 11 *supra*, or whether exigent circumstances warrant an exception to § 3109, *see generally* Sabbath v. United States, *supra* 391 U.S. at 591 n. 8, 88 S.Ct. 1755; Ker v. California, *supra* note 8; Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

States, 313 F.2d 870 (9th Cir. 1963); United States v. Viale, 312 F.2d 595 (2d Cir.), cert. denied, 373 U.S. 903, 83 S.Ct. 1291, 10 L.Ed.2d 199 (1963).

■ The defendants raise several objections to the searches apart from the alleged violation of § 3109. In that probable cause existed to arrest Johnson and Hellieson as they approached the apartment building, defendants argue that those arrests were unlawfully delayed to afford an opportunity to search the premises incident to arrest. However, any interior search incident to arrest could have been carried out with regard to Odell; and nothing was seized as a result of the delay which would not have been seized had Johnson and Helliesen been arrested outside. As we stated in United States v. Berkowitz, 429 F.2d 921, 926 (1st Cir. 1970), "[w]e are unaware of any right of a defendant to be arrested at a particular time." There is absolutely no indication that the primary purpose of any momentary delay was to allow a search inside the apartment.[14] *Cf.* McKnight v. United States, 87 U.S.App. D.C. 151, 183 F.2d 977 (1950).

■ Defendants also claim that the search and seizure of the flight bag containing cocaine violated the doctrine of Chimel v. California, 395 U.S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969).[15] Agent Egan testified that as Johnson was being placed under arrest in one room of the apartment, he threw the flight bag into the next room. The bag was within Johnson's control at the instant of arrest, and remained in plain view thereafter, thus giving rise to a *duty* to seize it. United States v. Palmer,

435 F.2d 653, 655 (1st Cir. 1970). *Chimel* prohibited general exploratory searches incident to arrest but did not erect impenetrable barriers at every doorway.

■ The final search and seizure claim, that entry without warrant was unjustified, is also without merit. Prior to the 11:05 meeting, the agents knew the identity of only one of the conspirators and did not know where the cocaine was located. In fact, the 11:05 meeting was not definitely arranged until about 10:35 that evening. The surveillance team was positioned in the area apparently on the hunch that the transaction would be completed there. This situation does not approach that of Niro v. United States, 388 F.2d 535 (1st Cir. 1968), where the agents could have affected the arrests twelve hours before they did so and inexcusably neglected to obtain warrants during the interim. Once the transaction herein started to unfold, it was obvious that delay in order to obtain warrants would have permitted the destruction of evidence and the escape of suspects, and might have increased the level of potential danger. Such exigencies override the general requirement of a warrant. *See, e. g.,* Ker v. California, *supra* note 8; Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970) (*en banc*).

With regard to the conspiracy convictions, the defendants challenge both the sufficiency of the evidence and the jury instructions on the issue of intent. Count 1 of the indictment charged a conspiracy to violate 26 U.S.C. § 4705(a), selling a narcotic drug not in pursuance of a written treasury order form.[16] Defend-

14. Government evidence established that the arrests were made inside pursuant to a pre-arranged plan to keep potential gun play at a minimum.

15. In *Chimel* police officers arrested the petitioner in his home and incident to that arrest searched his entire three-bedroom house, including attic, garage, and workshop, and caused his bureau drawers to be opened and searched. Condemning this search as unreasonable under the fourth amendment, the Court held that the scope of a search incident to arrest

should be limited to the person and the area from which he could obtain a weapon or inculpatory evidence.

16. 26 U.S.C. § 4705(a) provides:
"(a) *General requirement.*—It shall be unlawful for any person to sell, barter, exchange, or give away narcotic drugs except in pursuance of a written order of the person to whom such article is sold, bartered, exchanged, or given, on a form to be issued in blank for that purpose by the Secretary or his delegate."

ants argue that proof of their knowledge of and intent not to obtain the Treasury forms is requisite to a conviction for conspiracy.

While it is of course true that conviction of a conspiracy to transfer narcotics in violation of 26 U.S.C. § 4705(a), unlike the substantive offense, may not be sustained without proof of specific intent,[17] the defendants are incorrect in asserting that actual knowledge of the order form requirement was an essential element of the government's case. The essence of the jury's task in deciding here whether the defendants were guilty of participation in an illegal conspiracy involved determining, first, whether the object of the conspiracy constituted a substantive offense; second, whether in agreeing to work in concert the defendants knew or should have known that the specific object of the agreement was unlawful; and, third, whether one or more of the defendants acted in furtherance of the agreement. See, e. g., United States v. Falcone, 311 U.S. 205, 210, 61 S.Ct. 204, 85 L.Ed. 128 (1940). To find the requisite *mens rea*, the jury need not have found that the defendants actually knew that the statute did not penalize narcotics transferred pursuant to a treasury form issued for that purpose but need only have found beyond a reasonable doubt that the defendants thought that what they had agreed to do was illegal and that it was illegal in fact.[18] Cf. Nelson v. United States, 415 F.2d 483, 486–487 (5th Cir. 1969), cert. denied, 396 U.S. 1060, 90 S. Ct. 751, 24 L.Ed.2d 754 (1970); Nassif v. United States, 370 F.2d 147, 151–153 (8th Cir. 1966); Hanis v. United States, 246 F.2d 781, 786–788 (8th Cir. 1957). The court's general instructions to the jury were adequate on this point and the court properly refused the alternative submitted by the defendants.[19]

17. The Supreme Court, construing the part of § 2 of the Harrison Narcotic Act of 1914, on which 26 U.S.C. § 4705(a) is based, held that the substantive offense did not require a showing of specific intent. United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922). This decision has been cited with approval since the passage of § 4705(a), United States v. Wiesenfeld Warehouse Co., 376 U.S. 86, 84 S.Ct. 559, 11 L.Ed.2d 536 (1964), and has been specifically applied to that section, United States v. Jones, 438 F.2d 461, 466 (7th Cir. 1971). This court's discussion in United States v. Goldman, 450 F.2d 873 (1st Cir., 1971) of a defense of lack of knowledge that pills were narcotic is not to be read as contrary to the proposition that no specific intent is required under 26 U.S.C. § 4705 (a).

18. As we noted in our recent opinion in United States v. Medina, 455 F.2d 209 (1st Cir. 1971), the federal narcotics statute explicitly relieves the government of any responsibility for proving as part of its case-in-chief that a sale of narcotics, had it been completed, would not have been accompanied by an order form. 26 U.S.C. § 4724(c). Whether use of an order form is contemplated is a fact peculiarly within the knowledge of the accused and is available as an affirmative defense. Cf. United States v. Fleisch-

man, 339 U.S. 349, 359–364, 70 S.Ct. 739, 94 L.Ed. 906 (1950). The fact that in response to the government's claim of an illegal intent defendants would have had to show that they intended to use an order form should not mean that the government's own proof need be that specific.

19. Defendants' jointly submitted instructions Nos. 8 and 9 were:
"8. Likewise, with respect to Count 1, you may not find the specific intent necessary to convict a defendant under Count 1, unless you find beyond a reasonable doubt that it was an object of the conspiracy in which a defendant may be found to have participated that a narcotic drug would be sold, bartered, exchanged or given away not in pursuance of a written order of the person to whom such narcotic was to be sold, bartered, exchanged or given away on a form issued in blank for that purpose by the Secretary of the Treasury or his delegate, and that knowing of the requirement of such written order, such defendant participated in the alleged conspiracy with the intent that such form not be obtained.
"9. The specific intent necessary for a guilty verdict is the awareness by the defendant of the existence of all those facts which make his conduct criminal. United States v. Crimmins, 123 F.2d 271 (2 Cir., 1941)."

As to defendants' charge that the government's evidence was insufficient to establish that they had conspired with a specific intent to transfer narcotic drugs illegally, there was abundant evidence—to which the jury apparently attached conclusive weight—that the events leading up to the final sale and the transfer of the "sample" cocaine took place under the most clandestine of circumstances. The defendants took great care to assure themselves that they were not dealing with federal agents and numerous statements by the defendants indicated knowledge on their part that the contemplated sale was illegal. The jury was entitled to infer from this circumstantial evidence that the defendants specifically intended with full knowledge of illegality to transfer narcotics in violation of 26 U.S.C. § 4705(a). United States v. Vasquez, 429 F.2d 615 (2nd Cir. 1970). *See also* Ingram v. United States, 360 U.S. 672, 679, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959); Screws v. United States, 325 U.S. 91, 106, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945); Direct Sales Co. v. United States, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943); In re Coy, 127 U.S. 731, 753, 8 S.Ct. 1263, 32 L.Ed. 274 (1888); Developments in the Law, Criminal Conspiracy, 72 Harv.L.Rev. 920, 936–940 (1959).

Defendants' final contention is that the court's failure to give a requested conspiracy instruction was reversible error. The requested charge arguably combines the elements of individual participation and proof of a conspiracy independent of hearsay statements.[20] The district court did give correct instructions on each of these aspects of conspiracy. It stated that to be a conspirator "one must knowingly participate in the conspiracy intending to further its purposes," and described at length how one might be such a participant. With respect to the independent proof of the conspiracy, until a *prima facie* case of conspiracy was established the court limited all hearsay statements to the one who made them. Once a *prima facie* case was presented, the court gave more extensive instructions on the need for proof of the conspiracy independent of hearsay declarations.[21] Especially in view of the substantial independent evidence of the conspiracy, it was not reversible error not to repeat this instruction in the final charge to the jury.

Affirmed.

## ON MOTION FOR ORDER VACATING SENTENCES AND FOR REMAND

McENTEE, Circuit Judge.

Following the affirmance of their convictions on appeal, United States v. Bradley, Nos. 71–1186–1189 (1st Cir. Jan. 27, 1972), the defendants jointly moved in this court for vacation of sentences pursuant to Rule 35, Fed.R. Crim.P. Although, as the government correctly contends, Rule 35 motions are properly directed in the first instance to the district court, we reach the merits of defendants' motion by considering it as an appendage to their appeal.

Defendants allege that the district court sentenced them under the terms of a statute no longer in force.

---

20. Defendants' requested instruction was as follows:

> "3. The existence of a conspiracy cannot be established as against an alleged conspirator by evidence of the actions and declarations of his alleged co-conspirators, made in his absence. Such acts and declarations are admissible against him only when there is other proof of his connection with a conspiracy. Glasser v. United States, 315 U.S. 60, 75 [62 S.Ct. 457, 86 L.Ed. 680]

(1942); Ferina v. United States, 302 F.2d 95, 104–105 (8 Cir., 1962)."

21. The Court:

> "Now if you do by the evidence already here or hereafter submitted conclude that there was in fact such a conspiracy then the statements of any one of the co-conspirators are admissible against the other co-conspirators but you must determine by independent evidence, not by the statements themselves, as to whether there is a conspiracy."

The chronology of relevant events can be simply stated. In March 1971 the four defendants conspired to violate 26 U.S.C. § 4705(a) by selling cocaine not in purance of a written order form, in violation of 26 U.S.C. § 7237(b). A jury found them guilty of this offense on May 6, 1971, and the court sentenced each defendant to a five year term, the minimum punishment for first offenders under § 7237(b). Pursuant to § 7237(d), these sentences could not be suspended, nor could parole or probation be granted. On May 1, 1971, five days prior to sentencing, most of the existing federal narcotics laws, including §§ 4705(a), 7237 (b) and 7237(d), were repealed by the Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub.L. 91–513, 84 Stat. 1242 et seq., 21 U.S.C. §§ 801 et seq. The 1970 Act redefined the substantive offenses and generally liberalized the penalty provisions, in most instances no longer forbidding suspended sentences, parole, or probation. The defendants argue that since the 1970 Act was in force when they were sentenced, the court should not have felt constrained by § 7237(d), but should have considered the above sentencing alternatives. We disagree.

■■■ Whether a repealed provision remains in force as to pre-repeal activities is a matter of Congressional intent to be determined from statutory saving provisions. The general saving provision, 1 U.S.C. § 109, was originally enacted in 1871 in reaction to the common law holding in United States v. Tynen, 78 U.S. 88, 11 Wall. 88, 20 L.Ed. 153 (1871) that the repeal of a penalty provision totally abated the prosecutions of pre-repeal offenders. The statute provides, in pertinent part:

"The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability."

In United States v. Reisinger, 128 U.S. 398, 402, 9 S.Ct. 99, 32 L.Ed. 480 (1888), the Supreme Court held that the words "penalty," "forfeiture," and "liability" apply to criminal offenses *and the punishment therefor*.[1] Thus, unless the repealing statute explicitly provides otherwise, the repeal of a criminal statute neither abates the underlying offense nor affects its attendant penalties with respect to acts committed prior to repeal.[2]

■■■ We find no express, or even implied, indication in the 1970 Act that Congress intended that prior offenders not be sentenced under the pre-existing penalty provisions. To the contrary, § 1103(a), the specific saving provision of Pub.L. 91–513, states:

"Prosecutions for any violation of law occurring prior to the effective date of section 1101 shall not be affected by the repeals or amendments made by such section or section 1102, or abated by reason thereof."

Reading this section of the 1970 Act against the background of § 109, we hold that narcotics offenses committed prior to May 1, 1971, are to be punished according to the law in force at the time of the offense. In the instant case, this conclusion requires the continuing application of §§ 7237(b) and (d).

The defendants rely on the recent case of United States v. Stephens, 449 F.2d 103 (9th Cir. 1971), which involved a similar chronological sequence but reached the opposite conclusion with respect

---

1. See also the elaborate discussion in Lovely v. United States, 175 F.2d 312, 315–318 (4th Cir.), cert. denied, 338 U.S. 834, 70 S.Ct. 38, 94 L.Ed. 508 (1949).

2. *See* Moorehead v. Hunter, 198 F.2d 52 (10th Cir. 1952). For other instances where enforcement proceedings survived a statute's repeal due to the general saving provision, *see, e. g.,* Allen v. Grand Central Aircraft Co., 347 U.S. 535, 74 S. Ct. 745, 98 L.Ed. 933 (1954); De La Rama Steamship Co. v. United States, 344 U.S. 386, 73 S.Ct. 381, 97 L.Ed. 422 (1953); United States v. Carter, 171 F.2d 530 (5th Cir. 1948).

to § 7237(d). In *Stephens* the defendants were prosecuted and convicted for violations of 21 U.S.C. § 176a [3] and on May 24, 1971, received five year sentences, the minimum prescribed by § 176a. These sentences, however, were then suspended and each defendant was placed on probation for five years. The Ninth Circuit, denying mandamus against the trial judge, held that the suspension of sentence and the grant of probation were authorized by the terms of the 1970 Act. The Court concluded, after examining the specific and general statutory saving provisions, that neither preserved § 7237(d).

With respect to § 1103(a) of Pub.L. 91–513, relying on Korematsu v. United States, 319 U.S. 432, 63 S.Ct. 1124, 87 L.Ed. 1497 (1943), the Ninth Circuit held that "prosecutions" end with the determination of guilt and that the manner of sentencing in no way affects the prosecution of a case. *Korematsu* leads us to precisely the opposite conclusion. That case involved the finality, for purposes of appeal, of an order placing a defendant on probation after his conviction without first having formally sentenced him. The Court, citing Berman v. United States, 302 U.S. 211, 58 S.Ct. 164, 82 L.Ed. 204 (1937), held that the order was final since it "terminate[d] the litigation . . . on the merits" and "[*left*] *nothing to be done but to enforce by execution what ha[d] been determined*" (emphasis added). In *Korematsu* there was both a determination of guilt and imposition of disciplinary measures; no further court order was anticipated. In both *Stephens* and the instant case, until the sentences had been determined the proceedings had not reached a comparable state of finality. Where sentence is imposed, as noted in Berman v. United States, *supra* at

212, 58 S.Ct. at 166, "[f]inal judgment in a criminal case means sentence. The sentence is the judgment." We cannot agree, therefore, even reading § 1103(a) *in vacuo*, that "prosecution" excludes and is unaffected by sentencing. Our conclusion is strengthened when § 1103(a) is read against the background of § 109, which specifically mentions penalties and liabilities and which requires *express* statutory provisions to counteract its saving effect.

The court in *Stephens*, however, did not read the two sections together because it held that § 109 was inapplicable to the repeal of § 7237(d). Noting that § 109 was designed to obviate "mere technical abatement," the court concluded it did not apply to a provision like § 7237(d), the repeal of which did not threaten abatement of a substantive prosecution. We do not agree that § 109 is limited to those statutes the repeal of which, at common law, would have abated a cause of action or prosecution.[4] Although designed to avoid technical abatement, the statute is not limited to that situation. It refers unambiguously to "any statute," whether that statute defines a crime, prescribes a penalty, or elaborates on the nature of the penalty to be imposed. Section 7237(d) was part of the "liability incurred" by violation of § 7237(b). That is, had trial and sentencing been simultaneous with the offense, the defendants herein clearly would have been ineligible for suspended sentences, parole, or probation. Regardless of whether the legislative grant of these sentencing alternatives is viewed as a release of penalty,[5] under the mandate of § 109 the repealed statute, § 7237 (d) is "[to] be treated as still remaining in force."

The sentences having been legally imposed, they are hereby affirmed.[6]

---

3. 21 U.S.C. § 176a was repealed by the 1970 Act.

4. Nor do we find it so clear, as did the Ninth Circuit, that the repeal of § 7237 (d) would not have abated prosecutions at common law.

5. In an independent argument on the inapplicability of § 109 to the repeal of §

7237(d), the *Stephens* court contends that the grant of probation neither extinguishes nor releases a penal obligation.

6. Since sending this case to the printer our attention has been called to a similar holding in United States v. Fiotto et al., 2 Cir., 454 F.2d 252.