**UNITED STATES of America**

v.

**Edward D. D'ALO and Mark S. D'Alo.**

**Cr. No. 79–17.**

United States District Court,
D. Rhode Island.

Aug. 7, 1979.

---

See also, D.C., 486 F.Supp. 954.

Edwin J. Gale, Special Atty., U. S. Dept. of Justice, Providence, R. I., for plaintiff.

Thomas DiLuglio, Johnston, R. I., for Edward D'Alo.

Frank Caprio, Johnston, R. I., for Mark D'Alo.

## OPINION

PETTINE, Chief Judge.

Defendants are charged with manufacturing counterfeit slugs, in violation of 18 U.S.C. § 491(b), and conspiracy to commit the same offense, in violation of 18 U.S.C. § 371. This matter is before the Court on defendants' motion to suppress certain evidence seized in connection with their arrests.

In December of 1977 and January of 1978, officials of the Rhode Island State Police and the Warwick Police Department were investigating the robbery of a United Parcel Service (UPS) truck. In the course of their investigation these state and local officials met with agents of the Federal Bureau of Investigation and an FBI informant, Robert Oliva. Oliva told the police that he and three other men, including Edward D'Alo, had conspired in the planning and preparation for the UPS robbery, and also told them that Edward D'Alo was manufacturing slugs and silencers for weapons at the D'Alo Tool Company. However, the FBI asked the police to "back off" on their investigation because Oliva was still at large and providing the FBI with information. The government indicated it feared that the arrest of one of the suspects would jeopardize Oliva's safety and his ability to continue as an informant.

On the morning of February 2, 1978, Captain Ricci of the Warwick Police was contacted by an officer of the Providence Police Department, who told him that one of the suspects in the UPS robbery already had been arrested and was providing valuable information regarding the crime while in custody. The Providence Police were unaware of Oliva's existence as an informer and unaware that the State and Warwick Police had been informed of his activities.

Later that morning, a meeting was held at State Police headquarters between the State Police, Warwick Police, and the FBI. It was decided that the Warwick Police should obtain an arrest warrant for Edward D'Alo. They stated this was necessary to protect the undercover operation, the existence of which depended on keeping Oliva's identity as an informer concealed.

The Warwick Police obtained a "District Court Felony Complaint" for Edward D'Alo's arrest on the charge of conspiracy to commit robbery. They proceeded to D'Alo's place of business, the D'Alo Tool Company in North Providence, on the afternoon of February 2. Both Warwick and State Police officers participated in this mission. Edward D'Alo was arrested in the office area of his building, and while on the premises the police observed evidence of the manufacture of slugs. Mark D'Alo, nephew of Edward, who was observed disassembling a machine on which there was a slug, was also arrested; however, that arrest was without a warrant. Following these arrests, the police obtained a search warrant, which was executed late that afternoon, and seized slugs, materials for making slugs, a handgun, ammunition, and other matter pursuant to the warrant. The items relating to the counterfeiting charges are the subjects of defendants' motion to suppress.[1]

All of the grounds upon which defendants rely in their motion involve one undisputed fact: the failure of the State and local police to obtain a search warrant for counterfeiting materials before their entry into the D'Alo Tool Company. Additionally, they rely on a defective arrest warrant for Edward D'Alo. Defendants contend that the police had prior knowledge of the existence of the challenged evidence before that time, and that their entry was premised not upon an arrest for the UPS robbery but for the real purpose of conducting a warrantless search for evidence of counterfeiting. Defendants argue that this is violative of the warrant requirement of the Fourth Amendment.

As a preliminary matter the Court will address defendants' contention that the ar-

---

1. Edward D'Alo's prosecution on state charges in connection with the UPS robbery is irrelevant to this case.

rest of Edward D'Alo was constitutionally deficient because it was not based on a valid arrest warrant. Defendants contend that the "District Court Felony Complaint," which the arresting officers served on Edward D'Alo, does not conform to the formal requirements for an arrest warrant set forth in R.I.G.L. 10–10–3 and Rules 3, 4, 6, and 8 of the Rhode Island District Court Rules of Criminal Procedure.

■ The Court need not decide whether the document which the government has introduced as an "arrest warrant" is actually something less than that and not in keeping with the requirements of Rhode Island law.[2] Defendants gain nothing in their challenge to the formal sufficiency of the arrest warrant because R.I.G.L. 12–7–4(a) provides, in part:

A peace officer may without a warrant arrest a person for a felony, whenever: (a) The officer has reasonable ground to believe that a felony has been . . . committed and that the person to be arrested has committed . . . it.

For the purposes of this section, Rhode Island has held that "reasonable ground" has substantially the same meaning as "probable cause." *Palmigiano v. Mullen*, 377 A.2d 242 (R.I.1977). Here, there is little doubt that the police had probable cause to arrest Edward D'Alo, because a confessed participant in the UPS robbery had named him as a co-conspirator. Therefore, the police were within their authority under Rhode Island law.

■ The lawfulness of Edward D'Alo's arrest—an arrest by state officers for a state offense—is to be determined by state law, *Ker v. California*, 374 U.S. 23, 37, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), subject to minimal standards of the federal constitution implicit in the Fourth Amendment's reasonableness requirement. *United States v. DiRe*, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948); *Burks v. United States*, 287

F.2d 117 (9th Cir. 1961). The Supreme Court has held that, as a matter of federal law, arrest warrants are not essential to legitimize arrests based upon probable cause, *Gerstein v. Pugh*, 420 U.S. 103, 113, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), and, as we have seen, Rhode Island authorizes such arrests by statute where there is probable cause. Therefore, the Court concludes that the arrest of Edward D'Alo was valid both under Rhode Island and federal law. Mark D'Alo's arrest is closely related to the validity of the search of the D'Alo premises, to which the Court now turns.

Because a ruling on the present suppression issue is contingent upon the propriety of the police activity at the D'Alo Tool Company on February 2, 1978, the Court will attempt to reconstruct the events of that day in some detail, based on the testimony heard at the suppression hearing. When the police arrived at the D'Alo premises, they found Edward D'Alo in an office area to the immediate left of the entry way. They identified themselves and informed Edward D'Alo that they had a warrant for his arrest from the City of Warwick. During this time Captain Ricci of the Warwick Police backed out of the office, to allow one of Mr. D'Alo's companions to leave that area, and noticed Mark D'Alo at a machine approximately 20 to 30 feet away in the shop area of the building. With the knowledge in mind that one of the machines in the shop area had been used to make slugs, Captain Ricci "just kind of moseyed on over" to Mark D'Alo and asked what he was doing. At that point he looked down and observed a slug on the machine as well as a piece of scrap brass on the floor from which slugs had been punched out. When asked if he could identify any of the other materials that were being manufactured in the building, Ricci replied: "The only thing I can identify was the round discs because I was looking for that."

---

**2.** Defendants' reliance on R.I.G.L. § 10–10–3 is misplaced, because that section pertains to civil process. Rules 4 and 8 of the Rhode Island District Court Rules of Criminal Procedure do set out formal requirements for arrest warrants in felony and misdemeanor cases, respectively.

The Court will not consider the sufficiency under these sections of the "District Court Felony Complaint," which was presented to Edward D'Alo as an arrest warrant, because it finds that the arrest was otherwise valid, *infra*.

Lieutenant Mancuso of the Rhode Island State Police testified that he had "advised" Ricci and state police officers who accompanied Ricci of the existence of the slug operation. The state police particularly were told to "keep a look out" for slugs and for the fruits of an unrelated robbery which had occurred in Vermont.

Officer Blanchette of the State Police, who entered the D'Alo premises with the other policemen, was directed by one of his superiors to determine the identity of the people in the building. He approached Robin Lee D'Alo for this purpose and at her work bench, which was located to the rear of the shop area into which he entered, he observed a bucket of slugs. He also saw Mark D'Alo disassembling a piece of machinery. He was then directed by Lieutenant Martin to arrest Mark D'Alo. Officer Blanchette stated that before he entered the building he was told "to be on the lookout for a slug making operation." He also testified that while in the building he "had in mind" searching for slugs although "not particularly" at Robin D'Alo's work bench.

After the arrests of Edward and Mark D'Alo several policemen left the premises to obtain a search warrant. Nothing was taken from the premises during the initial entry. Several officers remained on the premises, within and without the building, but there was no testimony that they prevented anyone from entering or leaving.

The affidavit filed in support of the request for a search warrant contained only information derived during the initial entry into the building. No mention was made of Oliva's information regarding the counterfeiting operation, of which the police were aware prior to their entry.

Clearly, the actions of the state and local police went beyond that necessary to effect Edward D'Alo's arrest. Although Edward D'Alo was found in the office area to the immediate left of the entrance way, at least two officers ventured into a separate area of the D'Alo building, beyond the office in which they immediately encountered the object of their mission. This additional activity could not have been necessary to take Edward D'Alo into custody.

■ The legitimacy of this search in conjunction with Edward D'Alo's arrest is dependent on a number of factors. The first such factor to be considered is the motive or purpose of the police in conducting his arrest.

"An arrest may not be used as a pretext to search for evidence." *United States v. Lefkowitz*, 285 U.S. 452, 467, 52 S.Ct. 420, 424, 76 L.Ed. 877 (1932). In order to determine whether an arrest has been accomplished as a mere pretext to search, the Court must inquire into "the motivation or primary purpose of the arresting officer[s]." *Williams v. United States*, 418 F.2d 159, 161 (9th Cir. 1969). For example, a search may be invalidated where it is conducted incident to an arrest on a minor charge but uncovers evidence of a major, unrelated crime. *See Taglavore v. United States*, 291 F.2d 262 (9th Cir. 1961). The same result may be reached where the police delay an arrest until the defendant has entered his home, in order to search the home incident to the arrest which could have been made outside. *See McKnight v. United States*, 87 U.S.App.D.C. 151, 183 F.2d 977 (D.C.Cir. 1950). *Compare United States v. Bradley*, 455 F.2d 1181, 1187 (1st Cir. 1972) ("There is absolutely no indication that the primary purpose of any momentary delay was to allow a search inside the [defendant's] apartment." *Id.* at 1187).

In this case the Court does not hold that the "primary purpose" of the State and Warwick Police in effecting Edward D'Alo's arrest was to search for evidence of slug making. If it did so hold there would be little question as to the invalidity of the search. What it does hold is that the search was invalid for other reasons as hereinafter stated. Before proceeding further, it is necessary to characterize the manner in which they discovered the challenged evidence.

■ When they confronted and arrested Edward D'Alo, the police could lawfully conduct a search properly incident to his

arrest; that is, a search limited to his person and the area immediately within his control. *Chimel v. California*, 395 U.S. 752, 762, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). This they did not do—the police activity went beyond such limitation. As this Court sees it, the police obviously went beyond because they were looking for evidence. Certainly it cannot be contended that the identification of Robin Lee and Mark D'Alo was for the protection of the police. The evidence shows that Officer Blanchette "had in mind" to search for slugs, and that Captain Ricci had the same purpose. He stated, "The only thing I can identify was the round discs because I was looking for that."

Now, in essence, the government argues, be that as it may, the fact remains the discovery of the slugs by the police was justified because they were on the premises for the purpose of effecting a valid arrest; that once they were in the premises "[t]hey were entitled to assure themselves that no confederates were in [the immediate area] who might be armed and dangerous . . ." *United States v. Cepulonis*, 530 F.2d 238, 244 (1st Cir. 1976), and that this certainly means they had the right to approach Mark D'Alo and Robin Lee and in doing so they saw the slugs. The government concludes this validated their discovery. *U. S. v. Blalock*, 578 F.2d 245, 248 n.1 (9th Cir. 1978); *U. S. v. Sellers*, 520 F.2d 1281 (4th Cir. 1975); *U. S. v. Briddle*, 436 F.2d 4 (8th Cir. 1976). The Court does not argue with this position, and certainly if guns were in the area they could have been seized. However, this expansion of "the search incident to arrest" concept as recited in *Chimel v. California, supra,* cannot be used in this case to validate the discovery of other evidence of crime unrelated to the safety of the officers, because, as will be discussed *infra*, there was sufficient probable cause to obtain a search warrant. Where, in situations as in the case at bar, such other evidence is seen by the officers, a valid seizure requires satisfaction of the stricture of the "plain view" exception.[3]

As the Court stated in *United States v. Welsch*, 446 F.2d 220, 222 (10th Cir. 1971):

> The Supreme Court, in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, considered the plain sight doctrine under somewhat comparable circumstances. The opinion of the Court, insofar as it was concurred in by a majority, and as initially published, indicates that in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, the Court attempted to confine the exceptions to the warrant requirements "to their appropriate scope." The opinion of the Court in Section II D states: "The 'plain view' exception is intimately linked with the search incident exception * * *," and it also said: "To permit warrantless plain-view seizures without limit would be to undo much of what was decided in *Chimel*, * * *" The majority opinion in the same section also states:

> "To begin with, in *Chimel v. California, supra,* we held that a search of the person of an arrestee and of the area under his immediate control could be carried out without a warrant. We did not indicate there and do not suggest here, that the police must obtain a warrant if they anticipate that they will find specific evidence during the course of such a search. . . ."

. . . Again the opinion of the Court in *Coolidge* in the concluding paragraph of Section II D says in part:

> "We are convinced that the result reached in this case is correct, and that the principle it reflects—that the police must obtain a warrant when they intend to seize an object outside the scope of a valid search incident to arrest—can be easily understood and applied by courts and law enforcement officers alike."

It is well established that the plain view exception is not without its limitations:

---

3. The Court does not consider that the observations made in the area immediately surrounding Mark D'Alo come within the "search incident to an arrest" concept, for the simple reason that those observations were made before Mark D'Alo was arrested.

What the "plain view" cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came *inadvertently* across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification—whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being present unconnected with a search directed against the accused—and permits the warrantless seizure.

*Coolidge, supra,* 403 U.S. at 466, 91 S.Ct. at 2038 (emphasis added).

It is this "inadvertence" requirement with which the Court particularly is concerned in the present case.[4]

[T]he discovery of evidence in plain view must be inadvertent. The rationale of the exception to the warrant requirement, as just stated, is that a plain-view seizure will not turn an initially valid (and therefore limited) search into a "general" one, while the inconvenience of procuring a warrant to cover an inadvertent discovery is great. But where the discovery is anticipated, where the police know in advance the location of the evidence and intend to seize it, the situation is altogether different. The requirement of a warrant to seize imposes no inconvenience whatever, or at least none which is constitutionally cognizable in a legal system that regards warrantless searches as "*per se* unreasonable" in the absence of "exigent circumstances."

*Id.* at 469–471, 91 S.Ct. at 2040 (footnote omitted).

All this leaves the question as to how the inadvertence requirement is satisfied. It has been held that inadvertence is synonymous with an inability to establish probable cause to search prior to the arrest; *i. e.,*

that where the police have "preexisting knowledge of the identity and location of an item sufficiently in advance of the seizure to permit the warrant to be applied for and issued," *United States. v. Welsch, supra,* 446 F.2d at 223, the "plain view" justification must fail. This is consistent with a line of cases in this circuit, beginning with *Niro v. United States,* 388 F.2d 535 (1st Cir. 1968), applying the rule that,

while the failure to obtain a warrant when one could readily have been had is not of necessity fatal to a search or seizure concomitant with an arrest the nature of which had been fully anticipated, it will be fatal unless there are at least some countervailing factors. We need not define such circumstances. In the case at bar we find none. We hold that the government cannot rely upon an expected arrest to seize stolen goods, the presence of which it long had probable cause to know of, simply to avoid the inconvenience of obtaining a search warrant.

*Id.* at 539–40 (citations omitted).

The First Circuit Court of Appeals has cited *Niro* with approval in cases decided after *Coolidge. See United States v. Ferrara,* 539 F.2d 799 (1st Cir. 1976).

Applying the *Niro* holding, the first question to be asked is whether a warrant "could readily have been had"; *i. e.,* could the police have established probable cause in an affidavit filed with a magistrate prior to their entry into the D'Alo Tool Company. In *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), the Supreme Court discussed the requisites of an affidavit sufficient to support a search warrant where an informant's information is involved. The essential elements of the affidavit are two: "the magistrate must be informed of some

4. The "inadvertence" requirement of *Coolidge* was enunciated in Mr. Justice Stewart's opinion, in which only four justices fully concurred. Mr. Justice Harlan's concurring opinion did not endorse this requirement. Although some courts have questioned the precedential effect of *Coolidge* on this basis, *see United States v.*

*Morell,* 524 F.2d 550, 555 (2nd Cir. 1975), this Court will discuss and apply it because it is closely related to similar concepts developed in interpretation of the Fourth Amendment's warrant requirement, such as the rule in *Niro v. United States,* 388 F.2d 535 (1st Cir. 1968), discussed below at p. 951.

of the underlying circumstances from which the informant concluded" that the sought-after evidence would be in a defendant's possession, and he must be informed of "some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed . . . was 'credible' or his information 'reliable.'" *Aguilar v. Texas, supra*, 378 U.S. at 114, 84 S.Ct. at 1514 (citation and footnote omitted).

Prior to their first entry on February 2, the police had information as to the existence of a counterfeiting operation at the D'Alo Tool Company provided by Oliva, the government informant. Whether or not that information was sufficient to support a warrant, and therefore sufficient to bring this case within the scope of the *Niro* holding regarding failure to obtain a warrant, depends on application of the rule set forth in *Aguilar, supra.* As to the second requirement of *Aguilar*, that there be some indication of the informant's reliability, the information the police could have submitted to a magistrate was sufficient. They knew that he was a confederate of D'Alo in the UPS robbery by his own admission. He had identified three others as participants in the crime, one of whom was arrested by the Providence Police and confessed to his participation. On the morning of February 2, 1978 the Providence Police told Captain Ricci of this confession. Oliva remained a trusted government informer up to the time of the D'Alo arrests, and a magistrate could have been satisfied that he was reliable.

As to the requirement that the magistrate be informed "of some of the underlying circumstances from which the informant concluded" that the evidence of counterfeiting would be discovered at the D'Alo Tool Company, *Aguilar, supra*, at 114, 84 S.Ct. at 1514, the Court finds that the police could have satisfied a magistrate on this point. It is true that no evidence was presented in the context of the present motion to suppress regarding the source of Oliva's information, and the Court can only speculate that it was the fruit of Oliva's criminal confidence with D'Alo—a confidence evidenced by their joint participation

in the UPS robbery. Although this is not sufficient indicia of the source of the information, this would not have been fatal in an application for a search warrant:

> In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the [informant's] tip describe the accused's criminal activity in sufficient detail that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation. *Spinelli v. United States*, 393 U.S. 410, 416, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969).

Thus, the specificity of an informant's tip may compensate for failure to identify the source of his knowledge, and the Court finds that Oliva's information was sufficiently detailed to overcome the lack of an indication of the source of his knowledge. The testimony at the suppression hearing established that Oliva had told Lieutenant Mancuso that the counterfeiting operation, as well as the manufacture of silencers, was continuing at the D'Alo Tool Factory at the time of the arrests—i. e., up to and including February 2, 1978. Lieutenant Mancuso told his men to be on the lookout for "a power press, a tool die and boxes of slugs, the finished product" as well as for "gem flow switches and some starters" which were the fruits of an unrelated robbery. Mancuso's particularity and certainty regarding the items his men were likely to find warrants this Court's conclusion that the police could have obtained a warrant based upon the information supplied by Oliva. *See Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959) (Informant described in detail a suspect's clothing and the time of his arrival. This was held sufficient to satisfy a magistrate regarding the reliability of the informant's information.). The government does not contest this point; it admits that the police had probable cause to search for slugs prior to their entry.

Moreover, there were no "countervailing factors," *Niro, supra,* at 539, here which justify the failure of the police to obtain a warrant. When they decided to arrest Edward D'Alo on the morning of February 2, the police did not immediately rush to the D'Alo Tool Company with the urgent desire to take him into custody to protect their informant. Instead, they applied in due course for an arrest warrant, which was issued.[5] At that time they were well aware of Oliva's information, which was not augmented between the time of the decision to arrest and the execution of the arrest. Thus, the government can offer no exigency as an excuse here; if there was time to apply for an arrest warrant, there was time to apply for a search warrant. Nor can it rely on its desire to conceal Oliva's identity as an informant, because an informant's name need not be disclosed in a warrant affidavit. *Aguilar v. Texas, supra.*

The Court is greatly distressed by the opportunism displayed by the Warwick and State Police in this case. It has concluded that their observations in the shop area of the D'Alo Tool Company were technically within the scope of an exception to the warrant requirement which allows identification of persons on the premises for the protection of the police. This exception is recognized in this circuit. *See United States v. Cepulonis, supra.* Although the testimony at the suppression hearing established that the police were looking for the challenged evidence during their excursion into the shop area, the Court has refrained

from ordering suppression on this basis alone. To do so would imply that the police must justify such "body searches" by showing a reasonable apprehension of danger as their primary motive. Requiring such a showing would unduly jeopardize police safety.

■ However, where, as here, it is proven that the police could have obtained a search warrant for evidence whose discovery they fully anticipated, under circumstances which indicate that no intolerable delay would have been required, the Court will not allow the police to take advantage of carefully wrought exceptions to the warrant requirement in order to subvert the protections of the Fourth Amendment. In this instance, the talisman excuse of police safety cannot justify the excursion beyond the scope of activity necessary to effect Edward D'Alo's arrest, and the search conducted in the course of the identifications in the shop area of the D'Alo Tool Company must be condemned. Of course, a search warrant based on those observations is likewise invalid. *United States v. DiRe,* 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210 (1948), and the evidence seized on the basis of that warrant must be suppressed.[6]

■ However, suppression of this evidence may run in favor only of Edward D'Alo, because the government correctly argues that Mark D'Alo does not have standing under the rule recently enunciated in *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). In *Rakas* the Su-

---

5. The invalidity of the warrant they obtained is irrelevant on this point. See discussion at 947–948, *supra.*

6. Defendants also argue that the effective seizure of the counterfeiting evidence took place not after the search warrant was obtained but at the time of the initial entry, because the police did not leave the premises thereafter and remained until the warrant arrived. It is established in this circuit that "the exercise of dominion, especially where the agents secure the premises and physically restrain the occupants, . . . and display weapons, . . . may transform a mere entry into the premises into an effective seizure of articles therein for Fourth Amendment purposes." *United States v. Edwards,* 602 F.2d 458, at 469 n.12 (1st Cir.

1979). However, defendants have not shown such an exercise of dominion in this case. The police did remain within and without the building after the arrests, along with Robin Lee D'Alo, who was there until the search warrant arrived. But here, as in *United States v. Berrett,* 513 F.2d 154 (1st Cir. 1975), there was no evidence that the police purported to seize the evidence or to place a guard on it; nor was there evidence that they displayed weapons. *Id.* at 155. Even if they would not have allowed Robin D'Alo to remove the evidence, "this would not prove that the seizure had necessarily occurred at any time before the attempted disposition, since such a disposition might itself appear to the [police] an exigent circumstance justifying seizure." *Id.* at 155 n.*

preme Court abandoned an earlier rule which granted Fourth Amendment standing to persons "legitimately on the premises," *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), and held that a defendant must have had a possessory or proprietary interest in either the evidence seized or the premises searched in order to challenge a search and seizure. In this case, despite defendants' arguments, Mark D'Alo had neither—he seems to have been merely an employee of Edward D'Alo, any family relationship notwithstanding. Nor is this a case in which Mark D'Alo may claim "automatic" standing, *Jones v. United States, supra,* at 263, 80 S.Ct. 725, because neither count one nor count two of the indictment against Mark D'Alo requires as an element of proof possession of the evidence seized.

The motion to suppress is granted as to Edward D'Alo and denied as to Mark D'Alo.

The defendant will prepare an order accordingly.