UNITED STATES of America

v.

ONE PARCEL OF REAL PROPERTY WITH BUILDINGS, APPURTENANCES, AND IMPROVEMENTS, KNOWN AS 147 DIVISION STREET, LOCATED IN the CITY OF WOONSOCKET, RHODE ISLAND.

Civ. A. No. 87–0203 P.

United States District Court, D. Rhode Island.

May 19, 1988.

Michael P. Iannotti, Asst. U.S. Atty., Providence, R.I., for U.S.

John Baccari, Wakefield, Mass., Douglas A. Giron, Providence, R.I., for respondent.

## MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

In this federal forfeiture proceeding pursuant to 21 U.S.C. section 881(a)(7), Paul Latraverse asks this court to suppress evidence seized by state police officers, alleging that the officers unjustifiably entered his apartment by force and that they executed the search warrant during the night without good cause for doing so.

## INTRODUCTION

### FINDINGS OF FACT

1. On July 1, 1986, Paul Latraverse owned a multi-dwelling building located at 147 Division Street, Woonsocket, Rhode Island, and occupied a ground level apartment therein.

2. There are two entrances to the building: a front door and a side door, which is close to the back of the building. The front door, a thick oak door with no windows ("front building door") opens into a small communal area which contains the front door to Latraverse's apartment ("front apartment door"). The side door

leads to a small hallway off of which is the back door to the apartment.

3. At approximately 9:30 p.m., a team of officers from the Woonsocket police department arrived at the building to execute a state search warrant.

4. Upon arrival, the officers divided into three groups. Three officers, Daniel Pion, Detective Sansuisi, and an unnamed other proceeded to the front building door. Four officers, Herve Landreville, Sergeant Richard Flood, Detective William Shea, and patrolman Luke Gallant proceeded to the side door. The remaining officers positioned themselves at the perimeter of the building.

5. As the four officers proceeded to the side door, Daniel Pion, in the presence of the other two officers, began to knock on the front building door. As they approached the side door, the four officers encountered a man named Donald Oben exit the building. After brief questioning, Oben was "detained" by officer Gallant while the other three officers, finding the side door open, entered the hallway and prepared to enter the apartment. Landreville entered the hallway first and Flood followed.

6. According to Flood, once inside the hallway, they could hear Pion at the front door knocking and shouting "police."

7. Landreville testified that, after entering the hallway, he knocked on the back door to the apartment and said "police." He further testified that after approximately five to ten seconds, Flood stated, "let's go in" and then Landreville forced the door open with one kick. Flood testified that he did not hear Landreville knock or say police. I credit Landreville's testimony as accurately describing what transpired; all things being equal, when confronted with testimony about what one did and said and testimony about what one saw and heard, I must acknowledge the vulnerability of observation and choose the former over the latter. (Officer Gallant, who was still outside "detaining" Oben, did not see or hear what went on in the hallway.).

8. After kicking down the door, Landreville and Flood immediately entered a kitch-en area, which was empty. Landreville observed an open door off the kitchen leading to what appeared to be a basement; he descended the stairs. There was a bathroom off the kitchen and Flood observed the door closing and saw Latraverse and two other men inside. He ordered them to come out of the bathroom and had them sit at the kitchen table. Narcotics paraphernalia were found in the bathroom.

9. Meanwhile, the officers at the front door had encountered some difficulty. They finally managed to break through the front building door and officer Tempest immediately kicked in the apartment door. After passing through an empty living room, the officers proceeded to the kitchen area, where Latraverse and the other suspects were seated at the table under the supervision of Flood and Landreville. A full search ensued.

## CONCLUSIONS OF LAW

■ At the suppression hearing, there was considerable colloquy over whether state or federal law should be consulted to determine the validity of the officers' conduct. The government contends that federal law applies to all cases in federal court. Latraverse, however, argues that because the search was conducted by state officers pursuant to a state search warrant, Rhode Island law should govern.

While I would have presumed otherwise, this is a fairly disputed point among the federal district courts and courts of appeal. Some courts, for example, take the position urged by the government here. *See, e.g., United States v. Mitchell,* 783 F.2d 971, 973 (10th Cir.1986) (federal court should ignore state knock and announce statute and evaluate conduct of state officials executing state warrant exclusively under the fourth amendment); *United States v. Combs,* 672 F.2d 574, 578 (6th Cir.1982), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982) (admissibility of evidence obtained by state officers in prosecution in federal court is to be governed by federal law); *see also United States v. Hooks,* 780 F.2d 1526, 1535 (10th Cir.1986), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657,

90 L.Ed.2d 199 (1986) ("neither the statutes nor decisional law of the forum state control the admissibility of evidence in any phase of a federal criminal action"); *O'Rourke v. City of Norman*, 640 F.Supp. 1451, 1452 (W.D.Okl.1986) (legality of search by state police in federal court governed by federal, not state law); *United States v. Barker*, 623 F.Supp. 823, 846 (D.C.Col.1985) (same). Other courts, however, have taken the position that state law should be consulted. *See United States v. Speaks*, 649 F.Supp. 1065, 1067 (E.D.Wash. 1986) (federal court must analyze motion to suppress evidence seized by state officials without federal intervention under state law subject to the minimal requirements of the federal constitution). Indeed, this court has previously stated that, even though a federal prosecution had ensued, "the lawfulness of an arrest by state officers for a state offense is to be determined by state law" subject to the strictures of the fourth amendment. *United States v. D'Alo*, 486 F.Supp. 945, 948 (D.R.I.1979).

Two early cases by the First Circuit indicate that state law controls the validity of the execution of a warrant by state officers even though the resultant evidence is sought to be introduced in federal court. In *Jackson v. United States*, 354 F.2d 980 (1st Cir.1965), the court was confronted with a case somewhat similar to this one. There, four Boston police accompanied by two federal agents, executed a state arrest warrant at the defendant's home. In moving to suppress the evidence found in the course of the arrest, the defendant argued that the agents failed to comply with 18 U.S.C. section 3109. The court rejected this argument, however, holding that state law controlled the propriety of the entry. *Id.* at 981. Later in *United States v. Bradley*, 455 F.2d 1181 (1st Cir.1972), *aff'd*, 410 U.S. 605, 93 S.Ct. 1151, 35 L.Ed.2d 528 (1973), the court interpreted its *Jackson* ruling as standing for the proposition that "State law governs the arrest by state officials for federal offenses." *Id.* at 1185 n. 8.

Were these cases the last word in this circuit on the admissibility of state-seized evidence in federal courts, I would be inclined to test the officer's conduct under state law and would exclude the evidence for conduct that did not meet its requirements. A recent first circuit case, however, suggests that even if the state police violated some state law, the evidence would not be inadmissible in a federal trial.

In *United States v. Aiudi*, 835 F.2d 943 (1st Cir.1987), *aff'd*, —— U.S. ——, 108 S.Ct. 1273, 99 L.Ed.2d 484 (1988), Woonsocket police officers, believing that Aiudi was receiving stolen good in violation of state law, executed a search warrant at the defendant's home. Prior to the search, an agent with the Bureau of Alcohol, Tobacco and Firearms (ATF) was investigating Aiudi for possible violations of federal firearms statutes, and was exchanging information with the Woonsocket police. At the time the Woonsocket police executed the warrant, they alerted the ATF agent, who arrived after the search had begun and, after reviewing various records and inventory of firearms, concluded that firearms violations were evident and instructed the police to seize certain evidence that was later used to convict Aiudi at his federal trial. The defendant argued that the Woonsocket search warrant was invalid and moved to suppress the evidence on the grounds that, under the teachings of *Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), evidence obtained by state officers in violation of the constitution cannot be handed over to federal officials for use in federal trials. The court rejected this argument, holding that "even assuming that the appellant is correct in his contention that the weapons were in fact seized by the Woonsocket police in violation of the fourth amendment, it does not necessarily follow that the evidence must be excluded." 835 F.2d at 945.

The court noted that while the state warrant may have been invalid, the federal agent, under federal statute, had authority to conduct a warrantless search. The court reasoned that:

The *Elkins* rule was designed to protect fourth amendment rights by eliminating the incentive for federal law enforcement officials to encourage lawless searches

and seizures by state officers. Where, as in this case, no incentive exists for federal officials to encourage misconduct by state police, exclusion of state-seized evidence is inappropriate without first considering whether the benefit obtained from excluding the evidence outweighs the resulting costs.

*Id.* at 946. According to the court, because federal officials "could legally do exactly what the appellant claims the Woonsocket police did unlawfully, admitting this evidence at trial does not give the ATF an incentive to encourage state law enforcement officials to violate the safeguards afforded by the fourth amendment." *Id.* at 946. While conceding that exclusion of the evidence may deter the Woonsocket police from future unlawful conduct, the court noted that the "benefit is minimal in light of the penalty that exclusion would impose on the federal government." *Id.* Moreover, the court reasoned, the state officers were searching for violations of state law and had only an "indirect interest" in Aiudi's federal prosecution; "The evidence would presumably be excluded at a state trial on the alleged state offenses; this is a more 'close-fitting' deterrent for the violations here." *Id.*

*Aiudi* clearly calls into question the proposition expounded in *Jackson* and *Bradley* that state law controls the conduct of state officers. If, as the *Aiudi* court indicates, evidence unlawfully seized by state officers will not be suppressed if federal officers could have lawfully obtained the evidence by the same conduct, it seems meaningless to assert that state law determines the admissibility of state-seized evidence in federal courts. Of course, *Aiudi* involved state conduct that was violative of the federal constitution rather than state law, but its underlying principles seem to apply with equal force to state-law violations as well. First, where federal actors could have done lawfully what state actors may have done in violation of local law, there does not seem any reason to believe that the federal actors would encourage state actors to act lawlessly, the very evil proscribed by *Elkins*. Second, while it may be true that excluding such evidence

from federal trials may deter state officials from future unlawful conduct, the exclusion of such evidence from state trials on any state offenses seems to be a more "close-fitting" deterrent. 835 F.2d at 946. As one court reasoned:

> We are not insensitive to the claim that we should not encourage state officials to violate principles central to the state's social and governmental order. [citations omitted] But sanctions already exist to control state officer's conduct. He is 'punished' by the exclusion of evidence in the state criminal trial, and the state can, if it chooses, enforce its policies with respect to its own officers by permitting civil suits. We are persuaded that the additional deterrent effect to be gained from excluding this evidence in federal trials for federal offenses is small, and is far outweighed by the costs to society of excluding the evidence.... We therefore conclude that federal law governs the validity of the trunk search, and that the district court erred in applying [state] law to assess its validity.

*United States v. Rickus,* 737 F.2d 360, 364 (3d Cir.1984) [citations omitted]. Moreover, while I understand that some courts have held that "federal courts, in the interests of comity, should defer to a state's more stringent exclusionary rules," *United States v. Speaks,* 649 F.Supp. 1065, 1066 (E.D.Wash. 1986), it seems to me that the more salient principle is that "states are not free to impose on Federal courts requirements more strict that those of the Federal laws or Constitution." *United States v. Combs,* 672 F.2d 574, 578 (6th Cir.1982), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982). As one court has stated, the rule that federal standards should govern admissibility in federal trials "is grounded in sound policy considerations. If the states could require federal courts to exclude evidence in federal criminal cases, some convictions would undoubtedly be lost, and the enforcement of congressional policy would be weakened." *United States v. Shaffer,* 520 F.2d 1369, 1372 (3d Cir.1975).

I believe, therefore, that under the teachings of *Aiudi*, state-seized evidence is admissible in federal courts if it was obtained in accordance with federal requirements even though it may have been obtained by state officers in violation of state law. This rule not only conforms with the principles announced in many other circuits, *see, e.g., Rickus*, 737 F.2d at 363–64 ("Evidence obtained in accordance with federal law is admissible in federal court—even though it was obtained by state officers in violation of state law."); *United States v. Dudek*, 530 F.2d 684, 690 (6th Cir.1976) (observing that there is an "impressive argument for the proposition that evidence seized in ... violation of state law may nonetheless be admitted in a federal prosecution where the violation concerned would not be such as to require suppression of evidence under federal constitutional law, or federal statutory or case law"); *see also* W. LaFave, *Search and Seizure* 112–13 (2d ed. 1987) (collecting cases and observing that "if ... state officers conduct a search which is illegal under the law of the state where undertaken, the fruits thereof are not constitutionally barred from evidence in the federal courts"), but also conforms with the recognized principle that the "exclusionary rule is a judicially created remedy designed to effectuate the Fourth Amendment guarantees against unreasonable searches and seizures, not a personal right of a criminal defendant." *Aiudi*, 835 F.2d at 945. "[T]he rule is a needed, but grud[g]ingly taken, medicament; no more should be swallowed than is needed to combat the disease." *United States v. Janis*, 428 U.S. 433, 455 n. 29, 96 S.Ct. 3021, 3032 n. 29, 49 L.Ed.2d 1046 (1976) (quoting Amsterdam, *Search, Seizure, and Section 2255: A Comment*, 112 U.Pa.L.Rev. 378, 388–89 (1964)).

I will now turn to the question of whether, under the requirements of federal law, the officers' conduct was lawful.

■ The first question raised by Latraverse is whether the officers waited a reasonable time, after knocking and announcing "police", before they forced their way into the house. Federal law provides as follows:

> The officer may break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant.

18 U.S.C. section 3109. This requirement not only decreases the potential for violence and the destruction of property, *see United States v. Ruminer*, 786 F.2d 381, 383 (10th Cir.1986), but also protects "the precious interest of privacy as summed up in the ancient adage that a [person's] house is his castle." *United States v. DeLutis*, 722 F.2d 902, 909 (1st Cir.1983) (quoting *Miller v. United States*, 357 U.S. 301, 307, 78 S.Ct. 1190, 1194, 2 L.Ed.2d 1332 (1958)). The time that must pass before an officer may conclude that he is being refused admittance and thereby justified in forcing entry depends, of course, on the circumstances of each case. *Ruminer*, 786 F.2d at 383–84; *United States v. Davis*, 617 F.2d 677, 695 (D.C.Cir.1979), *cert. denied*, 445 U.S. 967, 100 S.Ct. 1659, 64 L.Ed.2d 244 (1980). In other words, the question is whether, given the circumstances, the officers were reasonable in assuming that they were not going to be let in and further waiting would be fruitless. *United States v. Ciammitti*, 720 F.2d 927, 934 (6th Cir. 1983), *cert. denied*, 466 U.S. 970, 104 S.Ct. 2342, 80 L.Ed.2d 816 (1984); *United States v. Allende*, 486 F.2d 1351, 1353 (9th Cir. 1973), *cert. denied*, 416 U.S. 958, 94 S.Ct. 1973, 40 L.Ed.2d 308 (1974); *Jackson*, 354 F.2d at 989. "Generally, a wait of 20 seconds is deemed adequate before the officers may force entry ... [but] 10 seconds of silence ... could mean that the occupant had not even started and hence was not going to." *DeLutis*, 722 F.2d at 909.

Here, when officers arrived at the house, Daniel Pion, in the presence of several officers, immediately began to knock on the outside front door while officer Landreville, sergeant Flood, and another proceeded to the side door. Officer Landreville, who was the first to enter the hallway

through the side door, testified that he knocked on the back door to the apartment and said "police." At this point, the sounds of knocking on the front door could be heard in the hallway. Approximately five to ten seconds after Landreville knocked, Flood said, "Let's go in" and Landreville forced the back door open with one kick. After Flood found the three suspects assembled in the bathroom and "secured" them in the kitchen area, the officers at the front door finally managed to break their way into the apartment.

While five to ten seconds seems like an exceedingly short time before forcing entry, given the circumstances of this case I cannot say that it was unreasonable. First, this is not a case where the officers executed the warrant at some unsuitable hour when slumbering occupants would be expected to dally some before responding. *See, e.g., United States v. Rodriguez*, 663 F.Supp. 585, 588 (D.D.C.1987). Second, given that the five to ten second wait at the back door, which in itself may be sufficient under *Jackson*, followed after the officers at the front door announced their presence, I cannot say that Landreville was unjustified in assuming that additional time would have been unavailing. The fact that the front door knocking continued and remained unanswered even before Landreville knocked on the back door certainly supports the inference that the occupants were not going to be promptly forthcoming. This is not to say that an announcement by one officer at the front door permits a second officer to crash through the rear door, although there is in fact some authority for that position, *see United States v. Bustamante–Gamez*, 488 F.2d 4, 10–11 (9th Cir.1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974) (holding that "officers are not required to announce at every place of entry" and approving an entry where officers made one announcement at the front door while seconds later other officers entered another), but it seems to me that Landreville's knowledge that the occupants were not responding to the front door knocks contributed to a reasonable belief, formed five to

ten seconds after he himself knocked, that an additional wait would be fruitless.

Accordingly, I hold that the forced entry was reasonable under the circumstances.

■ The second contention by Latraverse requires little discussion. His assertion that the officers did not have "good cause" to execute the warrant at night must fall since under federal law, "daytime" is defined as meaning the hours between 6:00 a.m. and 10:00 p.m. *See* Fed.R. Crim.P. 41(h). Here, the warrant was executed at approximately 9:30 p.m., rendering any showing of exceptional cause unnecessary.

For the foregoing reasons, the motion to suppress is hereby denied.

So Ordered.